5

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

CHARLENE HOWELL, as the personal )
representative of the Estate of  )
JAMES FARRELL HOWELL, deceased,  )
                                 )
          Plaintiff,             )
                                 )          CIVIL ACTION FILE
                                 )
     vs.                         )
                                 )  NO. 3:06CV417 (DRB)
J&J WOOD, INC.; TIMOTHY LEE      )
SIMONDS; QUALITY CASUALTY        )
INSURANCE COMPANY, INC., et.al., )
                                 )
          Defendants.            )
                                 )
_____ )

SUPERIOR COURT OF HARRIS COUNTY

STATE OF GEORGIA

KYONG MI KIM,                    )
                                 )
          Plaintiff,             )
                                 )  CIVIL ACTION FILE
                                 )
     vs.                         )
                                 )  NO. 06-CV-164
TIMOTHY LEE SIMONDS and          )
J&J WOOD, INC.,                  )
                                 )
          Defendants.            )
                                 )
_____ )

          Deposition of **TIMOTHY LEE SIMONDS**, taken
by counsel for the Plaintiff, pursuant  to notice
and agreement, under  the  Federal Rules of Civil
Procedure  and  the Georgia  Civil  Practice Act,
reported  by  Grace F. Lengmueller, RPR, held  at
427 South Broad Street,  Abbeville,  Georgia,  on
January 17, 2007, and commencing at 10:05 a.m.

ACCREDITED COURT REPORTERS
Post Office Box 1701
Columbus, Georgia 31902
(706) 323-3640
(800) 662-2741

ORIGINAL

1       Q     Okay.  How long did you live at your

2    3333 Highway 34 address in Franklin?

3       A     Since 2002.

4       Q     All right.  Prior to that address, where

5    did --

6       A     Incarcerated.

7       Q     What was the time period of incarceration?

8       A     January 14th, 1997; July the 10th, 2002.

9       Q     Was that here in Georgia?

10      A     Yes, sir.

11      Q     All right.  Prior to your -- what prison or

12   jail was that?

13      A      It was Jackson, Dooly, Calhoun, Rutledge,

14   Awtry, and Macon Trans.

15            THE COURT REPORTER:  Macon?

16            THE WITNESS:  Trans.  Transitional

17      center.

18   BY MR. CAIN:

19      Q     What was the reason, if you know, for the

20   transfers throughout those various systems?

21      A     Just routine.

22      Q     Just routine?

23      A     Yes, sir.

24      Q     Okay.  Prior to '97, what was your address?

25   Do you remember?

7

1      A    No, sir.

2      Q    Were you still in Georgia?  How long -- have

3  you lived in Georgia your whole life?

4      A    No, sir.  I've lived in Georgia, Alabama, and

5  Florida.

6      Q    Okay.  Tell me where you were born.

7      A    Fulton County.  Atlanta, Georgia.

8      Q    And you stayed in Fulton County, Georgia, in

9  Atlanta until how -- you were how old?

10     A    Well, I was in East Point till about -- about

11  five.

12     Q    Where did you move?

13     A    Douglasville.

14     Q    Douglasville?

15     A    Yes, sir.

16     Q    All right.  How long -- Douglasville,

17  Georgia, I take it?

18     A    Till '76.

19     Q    Which would have made you?

20     A    13.

21     Q    13?  After you moved from Douglasville at 13,

22  where did you go?

23     A    Heard County.

24     Q    How long did you stay in Heard County?

25     A    Been there ever since, off and on.  You know,

1  high school?

2       A    Went to work with Heard County Fire

3  Department and Ambulance Service.

4       Q    How long did you work with Heard County Fire

5  and Ambulance?

6       A    A year and a half.

7       Q    Were you living with your parents during that

8  time?

9       A    Yes, sir.

10      Q    After you -- what were you doing for Heard

11  County Fire?

12      A    I was a firefighter and a EMT.

13      Q    What did you do after leaving Heard County

14  Fire?

15      A    Troup County Fire Department.

16      Q    What was your reason for leaving?

17      A    More money.

18      Q    At Troup County?

19      A    Yes, sir.

20      Q    Did you move --

21      A    Yes, sir.

22      Q    -- to Troup County when you --

23      A    Yes, sir.

24      Q    Okay.

25           THE COURT REPORTER:  Wait until he

1    finishes.

2         MR. CAIN:  She just has a tough

3    time getting down both my question and

4    your answer, so if you can wait till she

5    finishes, it'll help her.  But we've got

6    you on video, so everybody can kind of

7    understand where we're going with it.

8    BY MR. CAIN:

9         Q    Do you remember the address of your Troup

10   County residence?

11        A    It was Versailles Apartments.  The street

12   address, no, sir.

13        Q    Okay.  How long did you work with Troup

14   County Fire?

15        A    About a year, year and a half.

16        Q    All right.  And then what did you do after

17   that?

18        A    Left to go to the Navy.

19        Q    You enlisted in the Navy?

20        A    Yes, sir.

21        Q    About what year was that?

22        A    '84.

23        Q    Did you go off to basic training?

24        A    Yes, sir.

25        Q    How long were you in the Navy?

1    you do at that point?

2         A    Went to Haleyville, Alabama.

3         Q    What was your reason for leaving Med Van?

4         A    They went out of business.

5         Q    What was your reason for going to Haleyville?

6         A    It's my mom's hometown and thought maybe I

7    could find some work up there.

8         Q    Was there anybody up there that you knew?

9         A    A little bit of family.  Yes, sir.

10        Q    Okay.  Who was up there?

11        A    My aunts, cousin.

12        Q    All right.  Where did -- do you remember the

13   address where you lived in Haleyville?

14        A    I started off at Pounder-Sims Road.  I don't

15   remember the number, no, sir.

16        Q    All right.  What did you do in Haleyville?

17        A    Went to work with Mayline Furniture.

18        Q    How do you spell that?  M-A-Y-L-I-N-E?

19        A    Yes, sir.

20        Q    What were you doing for Mayline?

21        A    Delivering furniture.

22        Q    And that would have been from when to when?

23   How long were you up there?

24        A    I was there for about a year.

25        Q    Did you work with Mayline the entire time?

1    A    Yes, sir.

2    Q    In case you do.

3         What did you go and do in Wedowee in November

4    of '04?

5    A    I went to school at West Georgia Tech.

6    Q    Let me ask you this:  Were you addicted to

7    crack cocaine from 1996 up until the point in time that

8    you were arrested for the forgery?

9    A    From 1996, was I addicted?

10   Q    Right.

11   A    If you mean by uses that when I go back to

12   use it, yes, I was addicted because I couldn't get away

13   from it.

14   Q    Okay.

15   A    Did I use it all the time?  No, sir.

16   Q    All right.  Was the -- was the reason that

17   you stole and wrote the checks from Margaret Allen in

18   order to obtain money to obtain crack?

19   A    Yes, sir.

20   Q    Would it be fair for me to say that any

21   conviction that you received at any point in time --

22   whether it be robbery, theft by taking, forgery,

23   negotiating worthless checks -- were all as a result of

24   trying to obtain money to obtain crack cocaine?

25   A    Yes, sir.

1      Q    April something, '05?

2      A    Yes, sir.

3      Q    All right.  Prior to attending West Georgia

4  Tech, had you ever had any experience operating a big

5  18-wheeler commercial rig?

6      A    Yes, sir.  I've drove the fire truck.  As far

7  as the -- the semi trailer, not -- not the semi

8  trailer, no, sir; not till I went to school.

9      Q    In other words, this is the first time that

10 you had obtained a CDL to drive a vehicle that you were

11 required to have a CDL to drive?

12     A    No, sir.  Well, CDLs, yes, sir.  Class 5 in

13 the beginning in Georgia to drive a fire truck.  But

14 then they -- they changed the law to CDL sometime in

15 the latter part of the Eighties; mid-Eighties, the

16 latter part of the Eighties.

17     Q    Did you have a Class 5 license to drive the

18 truck in Georgia in the early Eighties?

19     A    Yes, sir.

20     Q    What did you have to do in order to obtain

21 that?

22     A    I have a sponsor, take a test, written and

23 driving test.

24     Q    All right.  Did you go to all your classes at

25 West Georgia Tech?

1    A    Yes, sir.

2    Q    Pass all your tests?

3    A    Yes, sir.

4    Q    Pass all your written tests?

5    A    Yes.

6    Q    Pass all your road tests?

7    A    (Nodded head affirmatively)

8    Q    What do they do at that point?  They just

9    graduate you from the class?

10    A    No, sir.  You've got to take the state test

11    then and then go and take the -- the written test for

12    the -- you got to take the state driving test and take

13    the state written test on the computers at the --

14    you've got to be able to get your license in order to

15    graduate the class.

16    Q    So, basically, you have to go take a state

17    driving test and a state written test?

18    A    Yes, sir.

19    Q    Do you --

20    A    Up and above the school test.

21    Q    Do you have to submit an application to the

22    state that gives them certain information about your

23    driving history and background and things of that

24    nature in order to do that?

25    A    No, sir.

1    had been locked up.  And he asked me if I was still

2    smoking it, and I told him, I said, "No, sir."  And he

3    told me that everybody deserves a second chance.

4         Q    Well, what I want to do to the best of your

5    recollection is for you to tell me -- I'm going to

6    pretend to be Mr. -- Mr. Jones and for you to just tell

7    me, you know, to the best of your recollection

8    everything that you told him about your past felony

9    history.

10            MS. SELF:  Object to the form.

11            MR. ADAMS:  Object to form.

12            MS. SELF:  It's been asked and

13        answered.

14            MR. ADAMS:  Same objection.

15            THE WITNESS:  I told him -- told

16        him that I had been in prison; that --

17        for possession, theft by taking, motor

18        vehicle -- possession, theft by taking,

19        theft by taking motor vehicle, robbery,

20        and forgery.  And he asked me if I was

21        still doing it, and I told him no, sir.

22    BY MR. CAIN:

23        Q    And you told him you were -- you had been

24    addicted to crack cocaine?

25        A    Yes, sir.

1      A   I got two of my mother's checks and cashed

2  them.

3      Q   When was it that you did that?  I know you

4  were arrested for it in March.  When did that occur?

5      A   In March.

6      Q   Did it in March, and they got you in March,

7  huh?

8      A   (Nodded head affirmatively)

9      Q   Other than that positive drug test, have you

10  had any other positive drug tests?

11      A   No, sir.

12      THE WITNESS:  Do you think we can

13    get a bathroom break here --

14      MR. CAIN:  Sure.

15      THE WITNESS:  -- pretty soon?

16      MR. CAIN:  And -- go ahead and go

17    off the record.

18              (Brief recess)

19      MR. CAIN:  We're back on.

20  BY MR. CAIN:

21      Q   Mr. Simonds, the -- the dirty urine test, was

22  it crack cocaine?

23      A   Yes, sir.

24      Q   We had talked about the two -- the seven

25  counts of forgery in 2003.  Was that -- were those

```
 1   Ms. Allen's?
 2        A     Yes, sir.
 3        Q     Were they checks that you took?
 4        A     Yes, sir.
 5        Q     And then forged her name?
 6        A     Yes, sir.
 7        Q     What is your current release date?
 8        A     March the 12th, 2011.
 9        Q     Can you get shorter a sentence?  Get out on
10   parole or --
11        A     Yes, sir.
12        Q     Do they -- have they given you any --
13        A     No, sir.
14        Q     -- indication when you come up for parole?
15        A     (No response)
16        Q     Going through the hearings now?
17        A     Yes, sir.  Well, the -- I'm waiting on the
18   agree-in (phonetic) now, whatever it will be.
19        Q     I'm sorry?
20        A     Whatever the agree-in (phonetic) will be.
21        Q     Okay.  Do you have any additional counts
22   pending right now that you --
23        A     No, sir.
24        Q     I noted at some point in time there was a
25   battery charge that --
```

1    A    Yes, sir.

2    Q    Were you convicted of battery?

3    A    Yes, sir.

4    Q    What happened in that circumstance?

5    A    It was -- by -- you mean by what the sentence

6    was?

7    Q    You can start with that.  That'll be fine.

8    A    It was a 12-month sentence.

9    Q    What did you do to get sentenced 12 months

10   for battery?

11   A    I hit a can, and it hit my sister.

12   Q    Cause her any problems?  Physical problems?

13   I mean, how bad did it hurt her?

14   A    It didn't.

15   Q    Did you plead guilty to it?

16   A    Yes, sir.

17   Q    I don't want to belabor this, but I do want

18   to make certain that I've -- I've got accurate

19   information.

20        You were convicted of theft by taking in

21   1997?

22   A    Yes, sir.

23   Q    And you were convicted of possession of

24   cocaine in 1997?

25   A    Yes, sir.

71

1      Q      You were convicted of robbery in 1997?

2      A      Yes, sir.

3      Q      You were convicted of theft of a motor

4   vehicle in 1997?

5      A      Yes, sir.

6      Q      You were convicted of forgery, seven counts,

7   in 2004?

8      A      Yes, sir.

9      Q      You were convicted of forgery, two counts, in

10   2006?

11      A      Yes, sir.

12      Q      You were convicted of battery in 2006?

13      A      Yes, sir.

14      Q      You were convicted of theft by deception in

15   '96 or '97?

16      A      I don't remember.

17      Q      It may have been involved in -- prior to your

18   arrest associated with the numerous counts of

19   possession of cocaine and --

20      A      This was when?

21         MS. SELF:  Object to the form.

22   BY MR. CAIN:

23      Q      1996, 1997.

24      A      I don't remember.

25      Q      Okay.  You've had your license suspended on

1          MS. SELF:  This is in '88?

2          MR. CAIN:  Right now, it is.

3          MS. SELF:  Okay.

4          THE WITNESS:  No, sir.

5   BY MR. CAIN:

6      Q    Did you receive a ticket in July '88 for

7   speeding 71 in a 55?

8      A    I don't remember.

9      Q    Did the state of Georgia notify you of your

10  license suspension March 18th, 1989, through May 5th,

11  1990, as a result of accumulation of too much points?

12     A    No notification, but I had to go to a school

13  for excessive points.

14     Q    Did you receive a ticket October 18, 1989,

15  for speeding, an 80 in a 55, and likewise, receive a

16  ticket for driving with a suspended license, i.e.,

17  the -- which would be -- have been the period of time

18  of the previous points accumulation suspension?

19     A    The when -- repeat that, please.

20     Q    Did you receive a ticket in October of 1989

21  wherein you got a speeding ticket for 80 in a 55 and a

22  ticket for driving with a suspended license because of

23  the previous point suspension?

24     A    I don't remember.

25     Q    If I were to ask you whether you've ever had

1    any license, privilege, or permit ever suspended or

2    revoked, what would your answer be?

3         A    Yes, sir.

4         Q    All right.  That wasn't your answer to

5    Mr. Jones on your application for employment, though,

6    was it?

7         A    It was for the three years that it asked for.

8         Q    If you would -- this is DIS-053, Sub A and

9    Sub B.

10        A    Have you ever been denied a license, permit,

11   or privilege to operate a motor vehicle?  Under the --

12   under the three years that it was asking for.  That's

13   what I answered for.

14        Q    Well, that -- that's a previous question.

15        A    That -- that was -- but it's --

16             MS. SELF:  Object to the form.

17             THE WITNESS:  It's still sub --

18        it's under A and B of the same question,

19        sir.

20   BY MR. CAIN:

21        Q    Well, did you -- did you go to Mr. Jones and

22   say, "Are you talking about three years, or are you

23   talking about what the federal requirements are, which

24   is ever?"

25             MS. SELF:  Object to the form.

1          MR. ADAMS:  Object to form.

2          THE WITNESS:  No, sir.  I answered

3      the question on the --

4  BY MR. CAIN:

5      Q    Did you --

6      A    -- application.

7      Q    Did you ask -- did you ask him about that

8  question?

9      A    No, sir.  It was -- it said three years, and

10  that's the way I answered it.

11     Q    Well, that -- nothing in that sentence says

12  anything about three years, right?

13         MS. SELF:  Object to the form.

14         MR. ADAMS:  Same objection.

15         THE WITNESS:  In that sentence, no,

16     sir.  In that question, yes, sir.

17  BY MR. CAIN:

18     Q    Did you provide, as required by 391.21

19  entitled Application for Employment, Subpart C,

20  Background and Character, Subpart Number 9, a quote

21  statement setting forth in detail the facts and

22  circumstances of any denial, revocation, or suspension

23  of any license, permit, or privilege to operate a motor

24  vehicle that has been issued to the applicant or a

25  statement that no such denial, revocation, or

1    suspension has occurred?

2            MR. ADAMS:  Object to form.

3            MS. SELF:  Object to the form.

4            THE WITNESS:  No, sir.

5            MR. CAIN:  Okay.  Did I read that

6        wrong?

7            MR. ADAMS:  I don't know.  Don't

8        have a copy of it in front of me.

9            MS. SELF:  Not -- yeah.

10    BY MR. CAIN:

11        Q    Okay.  You would agree with me that if the --

12    if the regs required that you provide information

13    relative to your entire life as a licensed driver that

14    the information on that application would be incorrect?

15            MS. SELF:  Object to the form.

16            THE WITNESS:  No, sir.

17    BY MR. CAIN:

18        Q    You -- you would still maintain that that

19    information is correct?

20        A    Yes, sir.  For the question that it asked me.

21        Q    Well, isn't this a totally different

22    question?

23        A    No, sir.  Not if you say it's under A and B

24    there.  It's -- it's --

25        Q    I'm -- because the jury's going to get to

1    look at it, and they're going -- I mean, they're going

2    to get to make their own determination, but I'm asking

3    you for your opinion. As you look through that, do you

4    think that that's a totally -- that that is subsumed by

5    the previous question?

6            MR. ADAMS:  Object as asked and

7        answered.

8    BY MR. CAIN:

9        Q    Would you have -- would you have --

10           MS. SELF:  Object to the form.

11   BY MR. CAIN:

12       Q    -- a criticism of Mr. Jones' application for

13   employment if -- if that was meant to suggest that you

14   only had to provide three years of employment history

15   or three years of licensure?

16       A    It asked for three years on the -- all of it,

17   and he only required three-year MVR, and that's as far

18   back as I felt like that I had to go with it.

19       Q    Well, did you -- did you go back the three

20   years on your employment records?

21       A    No, sir.  I didn't put down Werner.

22       Q    Didn't -- you didn't put down Werner?

23       A    Yes, sir.

24       Q    You didn't put down the time that you had

25   been with McIntyre, right?

1       A    I didn't put down how much time, no, sir.

2       Q    And you didn't put the dates that you had

3   been with McIntyre?

4       A    No, sir.  I just put down McIntyre because I

5   didn't exactly know what the dates were at the time.

6       Q    Did you -- did you mean to exclude Werner for

7   any reason?

8       A    No, sir.  It was just -- wasn't really a job.

9       Q    Well, you worked for a week, right?

10      A    Worked for --

11      Q    That's what you --

12      A    Worked for one day.  Yes, sir.

13      Q    And they told you they were going to have to

14  let you go?

15      A    Yes, sir.

16      Q    Okay.  And they told you why they were going

17  to have to let you go?

18      A    That I didn't put the -- down on the

19  application and that they didn't want -- you know, they

20  didn't have no room for felonies.

21      Q    They asked you if you'd been convicted of a

22  felony in their application --

23      A    No, sir.

24      Q    -- didn't they?

25           They didn't?

81

1     Q    To drop off a load?

2     A    To drop a load off.

3     Q    Has DOT ever pulled you over and got you for

4 being overweight?

5     A    No, sir.

6     Q    When you -- when they weighed your trucks at

7 the plants or whatever, do they -- wherever you're

8 dropping the load off, do they do the whole truck at

9 once, or do they do it by axle?

10     A    They do it all -- the whole truck.

11     Q    At once?

12     A    Yes, sir.

13     Q    What is -- have you ever been so overweight

14 that they wouldn't take your load?

15     A    No, sir.

16     Q    Just somewhere in that gray area?

17     A    Yes, sir.

18     Q    Mr. Simonds, if you could, could you just

19 identify that for me, too, just for the purposes of the

20 record, Exhibit 12.  That was provided to us by --

21     A    Yes, sir.

22     Q    -- J&J Wood.

23     A    That's my log in August.

24     Q    A driver log?  Look through that.  I think --

25 I think what you'll find is that that's your log for

1    the entirety of your employment with J&J Wood.

2         A    Yes, sir.

3         Q    And you've got a log there on the front.  Is

4    that the way that y'all were taught to complete your

5    driver logs at your training --

6         A    That's the way we was --

7         Q    -- in school?

8         A    -- taught at school.  Yes, sir.

9         Q    All right.  Now, you did -- you did it the

10   way you were taught at school for a couple of weeks,

11   maybe, and then changed the way that you filled out

12   your driver's log to just have a start and stop?

13        A    Yes, sir.

14        Q    Or a start and end?  Why did you do that?

15        A    That's what Mr. Jim told me that -- that was

16   all they required.

17        Q    That was all who required?

18        A    That him and the DOT.  Actually, they didn't

19   really need the -- the DOT, I mean, you don't have to

20   have a log within a hundred miles.  We just -- that's

21   just what he -- that they required.  You didn't need to

22   have all that up in the lines.

23        Q    What is the responsibility that you had

24   for -- for putting accurate truthful information on it

25   knowing that the Federal Government would be looking at

1    it?

2          MS. SELF:  Object to the form of

3       the question.

4          MR. ADAMS:  Same objection.

5    BY MR. CAIN:

6       Q    What was your responsibility of putting

7    truthful and accurate information on them?

8       A    It was -- I guess to -- my responsibility,

9    yeah.  I mean, it -- put -- be truthful on it.

10      Q    Let me find what I'm looking for.

11           Were you ever untruthful on it, to your

12   knowledge?

13      A    Oh, I'm sure I was.

14      Q    Why?

15      A    Sometimes you can't re -- you know, remember

16   what all you've done; sometimes you've been in a hurry.

17      Q    But you were the guy driving the truck and

18   responsible for compliance with the regs, right?

19      A    Yes, sir.

20      Q    And they -- they taught you at school the way

21   to do it and the way not to do it, right?

22      A    Yes, sir.

23           MR. ADAMS:  Object to form.

24   BY MR. CAIN:

25      Q    And you would agree with me that they didn't

1    teach you in school to do it the way -- the start and

2    the end way that Mr. Jimmy wanted you to do it?

3        A    That's -- you're right.  They didn't teach

4    that.

5        Q    Okay.  And then insofar as the day of the

6    wreck is concerned, which was 10/5/05, you would agree

7    with me that that is not an accurate portrayal of the

8    time that you were on duty that day?

9            MS. SELF:  Object to the form.

10           THE WITNESS:  I would agree.  Yes,

11   sir.

12   BY MR. CAIN:

13       Q    And are there -- I think you've already told

14   me this.  You would agree that there are other days in

15   here that are not accurate from the time standpoint?

16       A    Probably so, yes, sir.  From a time

17   standpoint.

18       Q    And you just couldn't remember the day?  I

19   mean, I couldn't ask you were you accurate on the 2nd,

20   and you'd be able to tell me one way or the other,

21   right?

22       A    No, sir.

23       Q    When did you start your day on the day that

24   this event occurred; October 5th, 2005, the day that

25   Mr. Howell was killed and Ms. Kim was injured?