UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| CHARLENE HOWELL, etc., | § | |
| Plaintiff, | § | |
| v. | § | CASE NO. 06-417 |
| J & J WOOD, INC., et al., | § | |
| Defendants. | § | |

## PLAINTIFF'S MOTION TO ALTER, AMEND, OR VACATE; OR, ALTERNATIVE MOTION FOR CLARIFICATION OF THIS COURT'S JULY 6, 2007 ORDER BIFURCATING TRIALS

COMES NOW the Plaintiff, Charlene Howell, as Administratrix and personal representative of the Estate of James Farrell Howell, Deceased, and moves this Honorable Court to alter, amend, or vacate, or in the alternative, to clarify its July 6, 2007 order bifurcating the trial, for the following reasons, separately and severally:

1.      In the bifurcation order, the Court expressed concern about the potentially prejudicial impact at trial of some of the evidence expected to be presented by Plaintiff:

> The court is concerned that the evidence necessary to support the claim of negligent entrustment and maintenance, as well as the numerous claims of negligence and wantonness raised in the Fifth and Sixth Causes of Action, will unduly prejudice a jury's ability to fairly determine the basic issues of (1) whether Defendants Jones and Simonds personally were negligent in the direction and operation of the J&J Wood truck, (2) whether the plaintiff also acted negligently, thereby contributing to the cause of the collision, and (3) whether Simonds and Jones were personally wanton in the direction and operation of the truck. The evidence supporting the negligent entrustment and maintenance claims and the negligence and wantonness claims in the Fifth and Sixth Causes of Action deal with illegal acts other than driving, directing the driver's turning, and failure to put out emergency devices, and such evidence likely will portray Simonds, Jones, and J&J Wood in an extremely negative light. Without delving into the specifics, this evidence, which has no bearing on the basic issues of whether Simonds and

Jones acted negligently or wantonly at the time of the accident, or whether the plaintiff was contributorily negligent, likely would affect the jury's ability to impartially decide the basic issues of negligence, contributory negligence, and wantonness, even if the court were to give a limiting instruction.

To be sure, the Court correctly cited Fed.R.Civ.P. 42(b) for the proposition that a court may generally employ bifurcation in its discretion:

"in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim, cross-claim, counterclaim or third-party claim, or of any separate issue or any number of claims, cross-claims, counterclaims, third-party claims, or issues. ...

2.    However, the Court should know that **despite exhaustive research, counsel have not found a single reported opinion from any state or federal court, anywhere, that expressly approves the use of bifurcation in the context of an action under Alabama's unique wrongful death act.** In other words, Plaintiff respectfully asserts that this Court's order is completely unprecedented and therefore in need of revision or clarification. Why? Because in the context of an Alabama punitive-damages-only wrongful death case (as opposed to an injury case premised upon claims of negligence and wantonness where the evidence supporting Plaintiff's punitive damages claims may easily be severable), **all of the evidence of the Defendants' bad acts (i.e., the evidence that this Court observed would portray Simonds, Jones, and J&J Wood in an extremely negative light) is inextricably intertwined with proof of liability for the wrongful death**.

Indeed, under clear, long-standing and time-honored law and practice, in an Alabama wrongful death case the jury is instructed to return a verdict that "**should be directly related to the culpability of the defendants and necessity of preventing**

2

**similar wrongs in the future**." Ala. Pattern Jury Instruction 11.18; *Alabama Power Co. v. Turner*, 575 So.2d 551, 562 (Ala. 1991), cert denied 111 S.Ct. 2260.

Protection from any excessiveness of a verdict comes through post-judgment review under Ala. Code § 6-11-23 (1987) and the common law protections afforded by *Gore v. BMW*, 517 U.S.559 (Ala. 1996); *Hammond v. City of Gadsden,* 493 So.2d 1374 (Ala. 1986), and *Green Oil Co. v. Hornsby*, 539 So.2d 218 (Ala. 1989), not from restricting Plaintiff's evidence during the trial.

Hence, Plaintiff respectfully requests guidance from the Court.  Counsel have tried many Alabama wrongful death cases, but never previously have they been ordered not to introduce the evidence that is the very essence of their cause of action and burden of proof.

3.    In anticipation of the pretrial hearing scheduled for Monday, July 16 at 1:00 p.m., Plaintiff urges the Court to review the catalogue of evidence set forth below demonstrating how all the evidence of the Defendants' bad acts and omissions is directly relevant and material to proof of their liability for negligence and wantonness in causing Mr. Howell's wrongful death.

**PLAINTIFF'S CONTENTIONS**

The Plaintiff contends that at approximately 9:30 p.m. on October 5, 2005, J&J Wood's improperly maintained and overloaded log truck[1] was being driven by Defendant

---

[1]The J&J log truck was improperly maintained and overloaded in violation of at least the following Federal Motor Carrier Safety regulations and state statutes:

- The truck/trailer had unsafe tires in violation of FMCSR 393.75 and Ala. Code § 32-5-210;

(continued...)

Timothy Lee Simonds at a time when he was an unfit and disqualified to drive.[2]  Simonds,

---

[1](...continued)
- The vehicle was subject to an out-of-service order.  FMCSR 396.9;
- The vehicle had dirty, obscured, and unsafe lighting and reflectors in violation of FMCSR 393.9, 393.11, 392.33, and Ala. Code § 32-5-240, 242;
- The trailer carried an inadequately marked projecting load in violation of FMCSR 393.11, fn. 10;
- The trailer had inadequately colored rear side marker lamps in violation of FMCSR 395.11, Table 1;
- The trailer was overloaded in violation of FMCSR 393.75, Ala. Code § 32-9-20, and exceeded the manufacturer's gross vehicle weight rating limit of 74,000 pounds;
- The vehicle had in fact "broken down" when its tire failed, thereby constituting a condition likely to cause an accident or breakdown in violation of FMCSR 396.7; and
- The vehicle had parts and accessories that were not in good working order in violation of FMCSR 392.2 and 392.7.

[2]Simonds was disqualified from driving J&J's log truck on the day of the fatal accident for at least the following violations of the Federal Motor Carrier Safety regulations and state statutes:

- He was using crack cocaine on the day of the accident and was an admitted "daily user" of crack cocaine (FMCSR 382, 391 and 392; Ala. Code § 32-5A-191 (1975));
- He had a diagnosis and medical history of insulin-dependent diabetes (FMCSR 391.41), and see Chandler v. City of Dallas, 2 F.3d 1385, 1394-95 (5th Cir. 1994), cert denied 511 U.S. 1011 (1994) (drivers with insulin dependent diabetes present genuine substantial risk of harm as a matter of law) (citing cases);
- He did not have a valid medical card at the time of the collision (FMCSR 391.41);
- He had been on duty more than 14 hours, in violation of the hours of service allowed by the Federal Regulations (FMCSR 395);
- He was operating a vehicle with unsafe tires (FMCSR 393.75 and Ala. Code § 32-5-210);
- He was operating a vehicle in violation of an out-of-service order (FMCSR 396.9);
- He was operating a vehicle with dirty, obscured, and unsafe lighting and reflectors (FMCSR 393.9, 393.11 and 392.33 and Ala. Code § 32-5-240 and 242);
- He was operating a vehicle with an inadequately marked projecting load

(continued...)

while working within the line and scope of his employment with J&J, and while following

Defendant J&J co-owner Jimmy Jones, Jr.'s advice and direction, negligently and wantonly

attempted to turn around at night in the rain in the middle of a major four-lane U.S.

Highway blocking all four lanes of travel in an unlit area of the highway.  To be blunt,

Simonds should never have been permitted behind the wheel, and that particular truck and

trailer should never have been permitted out onto any public roadway.

Simonds was under the influence of cocaine at the time of this collision.  After the

collision which killed Mr. Howell, Simonds admitted to daily use of crack cocaine.  On the

night of the accident, he did not undergo the required drug testing set forth in the Federal

---

[2](...continued)
> (FMCSR 393.11, fn 10);
> - He was operating a vehicle with an inadequately colored rear side marker lamp (FMCSR 393.11, Table 1);
> - He was operating an overloaded vehicle (FMCSR 393.75, Ala. Code § 32-9-20, and manufacturer's gross vehicle weight rating on the vehicle of 74,000 pounds);
> - He was operating a vehicle that had in fact broken down on October 5 -- i.e., tire failed -- and which was in a condition likely to cause an accident or breakdown (FMCSR 396.7);
> - He was operating a vehicle with parts and accessories that were not in good working order (FMCSR 392.2 and 392.7);
> - At the time of this collision, Simonds had a duty and responsibility to operate his log truck according to the federal regulations and with all parts in good working order (FMCSR 392.2 and 392.7);
> - At the time of this collision, Simonds had a duty and responsibility not to operate his log truck in a condition likely to cause an accident or breakdown (FMCSR 396.7); and
> - At the time of this collision, Simonds had a duty and responsibility to ensure his log truck was in safe and proper operating condition before being driven (FMCSR 396.3).

Motor Carrier Safety Regulations.[3] J&J Wood, Inc. did not require him to undergo that

testing and continued to allow him to operate its truck that night and thereafter.[4]

---

[3]49 C.F.R. § 382.303(a)(1) requires commercial truck drivers involved in collisions that involve a loss of life or severe personal injury to be tested for blood alcohol content with such testing to be done "as soon as practicable following an occurrence" if there is loss of human life. If alcohol testing is not done with two hours, "the employer shall prepare and maintain on file a record stating the reasons the test was not promptly administered." 49 C.F.R. § 382.303(b)(1). If the test is not done within eight hours, "the employer shall cease attempts to administer an alcohol test and shall prepare and maintain the same record." *Id.* Neither Simonds nor J&J Wood ever complied with these regulatory requirements.

Further, Ala. Code § 32-5-200 (1975) provides:

> **Consent to blood test; definitions; incapacity; refusal to submit to test; notice of suspension, etc., of license; hearing; appeal.**
>
> (a) Any person who operates a motor vehicle on the public highways of this state who is involved in an accident that results in death or a serious physical injury to any person shall be deemed to have given consent to a test of his or her blood for the purpose of determining the alcoholic content of his or her blood or the presence of amphetamines, opiates, or cannabis. The test or tests shall be administered at the direction of a law enforcement officer having reasonable grounds to believe that the person, while driving a motor vehicle on the public highways of this state, was under the influence of alcohol, amphetamines, opiates, or cannabis. The person shall be informed by the law enforcement officer who is investigating the accident that failure to submit to a test will result in the suspension of his or her privilege to operate a motor vehicle for a period of two years.

In *Langelier v. Coleman*, 861 F.2d 1508 (11th Cir. 1988), the court held that a motorist suspected of driving while under the influence has no due process, First Amendment, or privacy right to counsel before deciding whether to submit to such tests. In *Miller v. Target*, 458 F.3d 1251 (11th Cir. 2006), the court held that a failure to take such a test, along with other facts, gave an officer probable cause to arrest the driver.

[4]The refusal to take the statutorily and regulatorily mandated post-accident tests is

(continued...)

J&J Wood failed to ensure Simonds was medically fit and/or capable of safe operation. J&J Wood failed to implement federally-required policies and procedures for driver qualifications and conduct, did not implement the required comprehensive maintenance program, and failed to properly maintain its truck.

Additionally, Plaintiff contends that J&J Wood wrongfully hired Timothy Lee Simonds.

### STIPULATIONS BY AND BETWEEN THE PARTIES AS CONTAINED IN THE JOINT PRETRIAL ORDER

(a)  The collision which caused James Farrell Howell's death took place on U.S. Highway 165 at the intersection of Misty Forest Drive south of Phenix City, Alabama, on October 5, 2005, at approximately 9:37 p.m. The J&J Wood logging truck/trailer, its tires and all of its component parts and accessories were owned by J&J Wood, Inc. and it was being driven by a J&J Wood driver.

(b)  Simonds and Jimmy Jones, Jr. were operating within the line and scope of their employment with J&J Wood, Inc. at all times material to the allegations contained in Plaintiff's First Amended Complaint;

(c)  The truck is a 1999 Mack CH613 Vin # 1M1AA18Y6XW105. The trailer is Vin # 5402B1GN002799. The GVWR of both is 74,000 pounds.

(d)  Charlene Howell is the wife of James Farrell Howell and is the proper party to bring this lawsuit as the Administratrix of the Estate of James Farrell Howell;

(e)  All defendants are properly designated in Plaintiff's First Amended Complaint;

---

[4](...continued)

akin to common law *fleeing felon* rule, whereby courts recognize that "analytically, flight is an admission by conduct." *Ex parte Weaver,* 678 So.2d 284, 290 (Ala. 1996). Simonds' refusal to take the tests supports an inference of his consciousness that he would have failed the tests. In any event, a refusal to take the required test is considered substance-use related conduct by the federal regulations and is punished just as if a driver tested positive (FMCSR 382.211, 382.501).

(f)     Experts James Sobek, Walt Guntharp and Joey Parker are properly qualified to render expert opinions previously provided to the parties in expert reports and depositions.

(g)     It is stipulated that the driver Timothy Lee Simonds had a duty and a responsibility to comply with the Federal Motor Carrier Safety Regulations and Alabama law in effect on October 5, 2005.

## APPLICABLE LAW

### Negligence

"The traditional elements of a negligence cause of action are a duty to a foreseeable plaintiff, breach of that duty, causation, and damage." *AALAR. Ltd. v. Francis*, 716 So.2d 1141, 1144 (Ala. 1998); *Franks v. Bolden*, 774 F.2d 1552, 1555 (11th Cir. 1985) (applying Alabama law).

### Wantonness

The Eleventh Circuit, in *Rommell v. Automobile Racing Club of America, Inc*, 964 F.2d 1096 (11th Cir. 1992), stated the distinguishing feature of wantonness as follows:

> Under Alabama law, wanton conduct "is the conscious doing of some act or the omission of some duty (by one who has) knowledge of the existing conditions, and (who is) conscious that from the doing of such act or omission of such duty injury will likely or probably result." *Copeland v. Pike Liberal Arts School*, 553 So.2d 100 (1989), quoting *Kilcrease v. Harris*, 288 Ala. 245, 251, 259 So.2d 797, 801 (1972).

*Rommell*, 964 F.2d at 1090 (footnote omitted).

The Alabama Supreme Court, in *Alfa Mut. Ins. Co. v. Roush*, 723 So.2d 1250 (Ala. 1998), clarified the standard for proof of wantonness, overruling a case that had misstated the standard:

> "Wantonness" is statutorily defined as "[c]onduct which is carried on with a reckless or conscious disregard of the rights or safety of others." Ala. Code 1975, § 6-11-20(b)(3). "Wantonness" has been defined by this Court as the

8

conscious doing of some act or the omission of some duty, while knowing of the existing conditions and being conscious that, from doing or omitting to do an act, injury will likely or probably result. ... To prove wantonness, it is not essential to prove that the defendant entertained a specific design or intent to injure the plaintiff. ... We pause here to note the concern expressed by the bench and bar over the definition of wantonness set out in *Lynn Strickland Sales & Service, Inc. v. Aero-Lane Fabricators, Inc.*, 510 So.2d 142, 145 (Ala.1987). Certain language in *Lynn Strickland* suggested that a specific design or intent to injure the plaintiff was an element of a claim for wantonness. To the extent that *Lynn Strickland* deviates from the statutory definition of wantonness, as followed by this Court, it is hereby overruled.

*Alfa v. Roush, supra*, at 1256 (citations omitted). This is the wantonness standard to apply in diversity cases in Alabama. *Erie R.R. v. Thompkins*, 304 U.S. 64 (1938).

### Evidence of Duty of Due Care

All motorists owe a duty of due care to others on the highway. *Jones v. Baltazar*, 658 So.2d 420, 421 (Ala. 1995); *Williams v. Pope*, 281 Ala. 382, 387, 203 So.2d 105 (1967). As will be discussed herein, there is a heightened duty on commercial motor vehicle drivers such as Simonds and on commercial motor carriers such as J&J.

Alabama substantive law holds that the Federal Motor Carrier Safety Regulations provide evidence of the standard of care. In *Osborne Truck Lines, Inc. v. Langston*, 454 So 2d 1317 (Ala. 1984), the Court found no error in the trial court's act of reading to the jury several sections of the FMCSR's that had been introduced into evidence, noting: "an instruction that the jury could consider the Motor Carrier Safety Regulations in determining defendants' standard of care would have been appropriate." 454 So.2d at 1326 (emphasis added). *See also Rodopoulos v. Sam Piki Enterprises, Inc.*, 570 So.2d 661, 665 (Ala. 1990) (following *Osborne Truck Lines* and holding that "FTC regulations are admissible in this fraud case with regard to the defendants' duty to disclose").

9

In addition to the federal regulations, Plaintiff will prove the violations of state statutory law (e.g., driving under the influence of a controlled substance). And, Plaintiff will introduce evidence through her expert witnesses of industry customs and practices that likewise will help to define the scope of the duty owed.

### Negligent Hiring and Negligent Entrustment

Alabama recognizes a cause of action for negligent hiring. *Ex parte McCollough*, 747 So.2d 887, 891 (Ala. 1999) ("These allegations of wrongful conduct would require proof that [Defendant] had notice or knowledge of the increased risk of harm ..."); *Ex parte Weems*, 711 So.2d 1011 (Ala. 1998) (discovery in negligent hiring action allowed to proceed despite pending criminal action); *Ex parte City of Huntsville*, 456 So.2d 72 (Ala. 1984) (negligent hiring action properly submitted to jury, but jury improperly apportioned damages); *Brown v. Vanity Fair Mills, Inc.*, 291 Ala. 80, 277 So.2d 893 (1973) (negligent hiring/entrustment cause of action does not encompass assault by employee away from employer's premises); *Dorsey v. Bowers*, 709 so.2d 51 (Ala. Civ. App. 1998) (in action alleging negligent hiring, verdict against employer but in favor of employee was not inconsistent, because negligence of other employees was alleged); *Nash v. Segars*, 682 so.2d 1364 (Ala. Civ. App. 1996) (summary judgment on negligent/wanton hiring affirmed because employee's burglary and arson was not in the line and scope of his employment).

Negligent entrustment is also a clearly established cause of action. *See Brown v. Vanity Fair Mills, supra*, 291 Ala. at 82-83, 277 So.2d at 895-96; *Day v. Williams*, 670 So.2d 914, 916-17 (Ala. 1995); *Wilbanks v. Brazil*, 425 So.2d 1123, 1125 (Ala. 1983);

*Reeves v. King*, 534 So.2d 1107 (Ala. 1988); *Liao v. Harry's Bar*, 574 So.2d 775 (Ala. 1990).

## NEGLIGENCE AND WANTONNESS OF TIM SIMONDS

Timothy Lee Simonds defrauded the State of Georgia and the Federal Government in order to obtain a commercial driver's license that he was unqualified to possess. In order to obtain a CDL, an applicant must physically be qualified to operate a commercial vehicle. In order to obtain a CDL, an applicant must certify to the State issuing that CDL that he is physically qualified and must provide truthful accurate information to the medical examiner conducting his physical. Mr. Simonds is a diagnosed diabetic requiring daily doses of insulin to treat his diabetic condition. The Federal Motor Carrier Safety Regulations are clear in that insulin-dependent diabetics are absolutely unqualified from a physical standpoint to operate a commercial motor vehicle the regulations state. Despite the fact that Mr. Simonds has been a diabetic since the 90s, he did not reveal this condition to the medical examiner which gave him his physical in December 2004. Additionally, Mr. Simonds was given a second physical examination in connection with his employment with Werner Enterprises and, again, failed to disclose his diabetic insulin-dependent condition. Regardless, at that examination in April 2005 (some six months prior to the collision that killed Mr. Howell), it was discovered that Mr. Simonds also had high blood pressure and thus he was only certified to drive a commercial vehicle until August 2005. Despite the expiration of that second fraudulently obtained medical card, Mr. Simonds continued to use his 2004 medical card to support his operation of a commercial vehicle. This medical card was given to the Thomaston Police Department when Mr. Simonds was involved in a trucking accident in Thomaston, Georgia. This medical card was also provided to the

Phenix City officer charged with investigating the collision which killed James Farrell Howell during his homicide investigation. This evidence bears not only on Mr. Simonds' qualifications under the regulations to even be a commercial driver, his physical fitness and his competence on the day that he drove his truck into the path of Mr. Howell's vehicle, but also bears on his credibility with the jury and the plaintiff's right to cross-examination of witnesses.

In addition to being disqualified for diabetes requiring insulin treatment, for high blood pressure, and for failure to have a valid medical card at the time of this collision, Mr. Simonds was also disqualified given his admission of a three-year substance abuse history and the daily use of crack cocaine. The Federal Regulations are clear that the use of crack cocaine medically disqualifies an individual from being a licensed commercial driver. The evidence of Mr. Simonds' crack cocaine abuse is contained in his Georgia Department of Corrections file, in his deposition testimony, and in his felony conviction records, all of which bear not only on Mr. Simonds' qualification to be operating the vehicle on the day that he was and in the manner that he was, but likewise to his credibility which is at issue and material to this case.

Further, Simonds was disqualified at the time of this collision for operating his vehicle in excess of the hours of service regulations set forth by the Federal Government. Having come on duty at 6:00 a.m., and having kept the logs in the manner that he did, Mr. Simonds was only afforded a 14-hour period of time to be "on duty" before being disqualified as a commercial operator. At the time of this collision at 9:37 p.m. in Phenix City, Alabama, Mr. Simonds had exceeded this 14-hour time limit. Moreover, he had done

12

so as a diabetic who had not taken his required insulin at any point in time during that day

or the 24 hours preceding the collision.

In addition to the foregoing, Simonds operated the tractor and trailer wantonly, or

at least negligently, when he stretched it across the U.S. highway at night in the rain, when

the trailer was dirty, not adequately illuminated, and inadequately equipped.

The jury may find from this and other evidence that Simonds violated FMCSR

392.14, "Hazardous Conditions; Extreme Caution":

> Extreme caution in the operation of a commercial motor vehicle shall
> be exercised when hazardous conditions such as those caused by snow, ice,
> sleet, fog, mist, rain, dust, or smoke, adversely affect visibility or traction.
> Speed shall be reduced when such conditions exist.  If conditions become
> sufficiently dangerous, the operation of the [CMV] shall be discontinued and
> shall not be resumed until the [CMV] can be safely operated. ...

49 C.F.R. § 392.14.

Similarly, the jury may find that Simonds, Jones, and J&J Wood violated FMCSR

§ 392.8, which requires a commercial driver to use the emergency equipment required by

§ 393.95:

> No commercial motor vehicle shall be driven unless the driver thereof
> is satisfied that the emergency equipment required by Sec. 393.95 of this
> subchapter is in place and ready for use; nor shall any driver fail to use or
> make use of such equipment when and as needed.

49 C.F.R. § 392.8 (emphasis added).  Section 393.95(f) requires "Warning devices for

stopped vehicles," and paragraph (f)(2) requires a vehicle to have either (i) three warning

triangles or (ii) six fusees or three flares.  49 C.F.R. § 393.95(f)(2).

FMCSR § 392.22 provides as follows:

> (a) Hazard warning signal flashers.  Whenever a [CMV] is stopped
> upon the traveled portion of a highway ..., the driver of the stopped [CMV]
> shall immediately activate the vehicular hazard warning signal flashers and

13

continue the flashing until the driver places the warning devices required by paragraph (b) of this section. ...

(b) Placement of warning devices — (1) General rule. ... [W]henever a [CMV] is stopped on the traveled portion of a highway ..., the driver shall as soon as possible, but in any event within 10 minutes, place the warning devices with which the [CMV] is equipped in conformance with the requirements of Sec. 393.95 of this subchapter, in the following manner:

(i) One at the traffic side of the stopped [CMV], within 10 feet of the front or rear of the [CMV];

(ii) One at a distance of approximately 100 feet from the stopped [CMV] in the center of the traffic lane ... occupied by the [CMV] and in a direction toward traffic approaching in that lane; ....

49 C.F.R. §392.22.

All of the above-referenced information is evidence of Mr. Simonds' negligence and wantonness at the time of the collision that killed Mr. Howell. It is likewise evidence material to the issues of judgment, ability to recall accurately, credibility, and knowledge.

### NEGLIGENCE AND WANTONNESS OF J&J WOOD AND OF JIMMY JONES

J&J Wood, despite its concession of *respondeat superior,* has been sued in a wrongful death case where the focus of the jury's attention is on the Defendant's conduct for its own independent misconduct. J&J's fault stems from maintenance issues associated with its truck which caused and/or contributed to the collision involving Mr. Howell, the qualification of and training of Tim Simonds, and its failure to properly conduct an inquiry into Mr. Simonds' background before entrusting him with a commercial vehicle. Federal Motor Carrier Safety Regulations specifically address the employer's responsibility for ensuring that the vehicles its drivers are operating are in compliance with the federal

regulations.  This is not a derivative responsibility, it is an independent responsibility for which there is independent liability.

A motor carrier's failure to inquire into the qualification of its drivers is a breach of the FMCSR's and is a serious health and safety violation.  The carrier "should have known" what an appropriate inquiry would have disclosed.  In *Used Equipment Sales, Inc. v. Department of Transp.*, 54 F.3d 862 (D.C. Cir. 1995), the court, per then-Judge Ginsburg, held that "the FHWA's interpretation of [49 U.S.C.] § 521(b)(2)(A), making each separate act of a motor carrier in violation of an FHWA regulation — here each dispatch of a disqualified driver — a separate 'health or safety violation' is entirely reasonable." 54 F.3d at 865.  The court also noted that "It is undisputed that the [motor carrier] violated [49 C.F.R.] § 391.15 if it 'knew' or 'should have known' that [the subject driver's] license was suspended when it dispatched him." 54 F.3d at 866.  The court cited *Contract Courier Services, Inc. v. Research and Special Programs Admin*, 924 F.2d 112, 114 (7th Cir. 1991), for the following proposition: "the 'should have known' concept requires inquiry and the law treats a person as possessing whatever knowledge inquiry would have produced." *Contract Courier*, as quoted in *Used Equipment*, 54 F.3d at 866.

The failure to properly inquire prior to employment and then to entrust establish a failure to comply with 49 C.F.R. §§ 391.41 and 391.43.  Under § 391.41(b)(9), "A person is physically qualified to drive a commercial motor vehicle if that person ... Has no mental, nervous, organic, or functional disease or psychiatric disorder likely to interfere with his/her ability to drive a commercial motor vehicle safely."  Section 391.43 then provides requirements for the medical examination of a prospective driver.  Section 391.43(f) provides that "The medical examination shall be performed, and its results shall be

15

recorded, substantially in accordance with the following instructions and examination form."
Under the "instructions" portion of that subsection, the following appears: "The
examination should be made carefully and at least as complete as indicated by the
attached form." § 391.43(f).

These failings fall directly on J&J and Jones. "A motor carrier shall not require or
permit a driver who is disqualified to drive a commercial motor vehicle." 49 C.F.R. §
391.15(a). A driver is qualified if he is physically qualified under §§ 391.41-391.49. 49
C.F.R. § 391.11(b)(6). The FHWA publishes Interpretations of the FMCSR. The
Interpretations of § 391.41 begin with the following question and answer:

> **Question 1:** Who is responsible for ensuring that medical
> certifications meet the requirements?
>
> *Guidance:* Medical certification determinations are the responsibility
> of the medical examiner. The motor carrier has the responsibility to ensure
> that the medical examiner is informed of the minimum medical requirements
> and the characteristics of the work to be performed. The motor carrier is also
> responsible for ensuring that only medically qualified drivers are operating
> CMVs in interstate commerce.

Additionally, J&J Wood had its owner/supervisor, Jimmy Jones, on the scene prior
to and at the time of this collision, and it is now undisputed that he was involved in the
decisions that were made, including the decision to drive the vehicle in the condition that
it was in, to allow Tim Simonds to drive that vehicle, and the direction of Mr. Simonds in
the operation of that vehicle, all with the knowledge of the federal regulations and the
multiple citations associated with the conditions of the truck and trailer. The fact that
Jimmy Jones, Jr. and J&J Wood were also charged with the responsibility of knowing the
regulations, particularly the hours of service regulations, but nevertheless directed Tim
Simonds back behind the wheel of a commercial vehicle at a time when he was

16

disqualified, is direct evidence of J&J Wood's own negligence and wantonness separate and apart from Tim Simonds.

Moreover, the decisions made that evening and the manner in which Mr. Simonds conducted his turnaround maneuver (whether a U-turn or otherwise) shows he was an inexperienced, untrained driver making poor decisions. The federal regulations require, before placing a driver in service, that J&J Wood ensure that by reason of experience, training, or both, a driver is capable of operating a vehicle safely and in conformance with the regulations. J&J and Jones clearly breached these duties as well.

## CREDIBILITY AND RIGHT TO CROSS-EXAMINATION

Many of the above-referenced issues and theories of recovery involve acts and statements which bear on the credibility of witnesses and which might overlap with other theories implicating other defendants for actions related to James Farrell Howell's death. One such example relates to the numerous felony convictions associated with Mr. Simonds and his admissions that all convictions were related to crack cocaine abuse while likewise providing information to the Georgia Department of Corrections in September 2006, that he had a three-year substance abuse history wherein he abused crack cocaine on a daily basis. This is material to this case in that Mr. Simonds failed to obtain a post-accident drug test as required by the Federal Motor Carrier Safety Regulations. Both Simonds and J&J Wood contend that neither knew he was required to take a post-accident test under the circumstances. The evidence, however, suggests that J&J and Mr. Simonds were both provided with information prior to this collision which would have made them knowledgeable of that requirement.

17

Simonds' material misrepresentations include:

- That he was not diabetic;

- That he was not a drug user;

- That he was medically qualified to operate a vehicle;

- That he had suffered no license suspensions or revocations;

- That he had not received any citations for the three years prior to his employment with J&J Wood;

- That he had no knowledge of post-accident drug testing;

- Misrepresentations about his past employment on Federal applications;

- Misrepresentation about his employment status to employers;

- Misrepresentations to police officers about the circumstances of the collision;

- Failure to meet the requirements of his parole in 2002;

- Falsification of Federal Duty Status Logs; and

- Misrepresentations on federally-required documents.

Hence, all of the foregoing matters of credibility are fair game during this trial, and Plaintiff must be allowed to introduce each of the following facts that bear on Simonds' credibility:

A.    Tim Simonds' felony convictions

      a.    3/24/04 - 7 counts forgery in the first degree (SCH001-009)
      b.    7/16/97 - 1 count robbery (NPS291)
      c.    7/16/97 - 1 count violation of Georgia Controlled Substances Act (NPS291)
      d.    7/16/97 - 1 count theft by taking (NPS204)
      e.    7/16/97 1 count - theft by taking motor vehicle (NPS204)
      f.    6/26/06 - 2 counts forgery in the first degree (DOC006)
      g.    6/26/06 - 1 count simple battery (DOC141).

B.    Tim Simonds was addicted to crack cocaine

    a.    Tim Simonds admitted to using crack cocaine on a daily basis with a history of three years abuse in March 2006 (FMCSR 382.213 and 391)

    b.    Tim Simonds failed to take his regulatorily and statutorily mandated post-accident drug test after the collision (FMCSR 382.303)

    c.    Federal Regulations treat such failure as an absolute refusal (FMCSR 40.191(a)(3))

    d.    Refusals are considered substance-use related conduct by the federal regulations and are punished just as if a driver tested positive (FMCSR 382.211, 382.501).

C.    Tim Simonds was an insulin-dependent diabetic

    a.    Medical records, both before and after this collision, indicate Timothy Simonds was an insulin-dependent diabetic

    b.    Federal Regulations absolutely prohibit licensure of an insulin-dependent diabetic (FMCSR 391)

    c.    Federal Regulations absolutely prohibit operation of a commercial vehicle by an insulin-dependent diabetic (FMCSR 391)

    d.    Federal Regulations state specifically:

"A person is physically qualified to drive a commercial motor vehicle if that person . . . has no established medical history or clinical diagnosis of diabetes mellitus currently requiring insulin for control."

Instructions to the medical examiner in the Regulations read:

"diabetes mellitus is a disease which, on occasion, can result in a loss of consciousness or disorientation in time and space. Individuals who require insulin for control have conditions which can get out of control by the use of too much or too little insulin, or food intake not consistent with the insulin dosage. Incapacitation may occur from symptoms of hyperglycemic or hypoglycemic reactions (drowsiness, semiconsciousness, diabetic coma, or insulin shock)."

. . . "The FMCSA has consistently held that a diabetic who uses insulin for control does not meet the minimum physical requirements of the FEDERAL MOTOR CARRIER SAFETY REGULATION."

e.    Mr. Simonds was not physically capable of being behind the wheel of a commercial vehicle on October 5, 2005. Had he complied with the regulations, and not been driving a log truck that evening, Mr. Howell would not have been killed.

D.    Tim Simonds' deposition and application to drive a commercial motor vehicle contain inconsistencies and untruthful statements

a.    J&J Wood Application
b.    Werner Enterprises Application
c.    Application for CDL to Georgia Dept. of Public Safety
d.    Reasons for termination from previous employers
e.    Number of license citations
f.    Number of license suspensions
g.    Representations related to his physical ability to license examiners, medical examiners, and employers.

E.    Tim Simonds did not have a valid medical card

a.    On October 5, 2005, the most recent medical card issued to Tim Simonds had expired.[5]
b.    On October 5, 2005, Mr. Simonds' most recent medical card had expired almost two months prior, and he was operating this vehicle without a valid medical card. The reason for its expiration was a diagnosis of high blood pressure likely to interfere with his ability to operate a commercial vehicle. Said condition was not corrected and verified by a re-examination.
c.    If Tim Simonds had followed the statutorily mandated requirement that he not drive a commercial motor vehicle unless physically qualified and in possession of valid medical card, he would have never been in the J&J Wood log truck on October 5, 2005, and Mr. Howell would not have been killed.

_____

[5]The medical card was no good as it was obtained fraudulently by failure to acknowledge a diagnosis of diabetes and the use of illegal drugs.

"A person shall not drive a commercial motor vehicle unless he/she is physically qualified to do so and . . . has on his/her person the original, or a photographic copy, of a medical examiner's Certificate that he/she is physically qualified to drive a commercial motor vehicle."

F.  Tim Simonds was physically over the allowed hours of service for a commercial vehicle operator at the time of the collision that killed Mr. Howell

a.  Federal Regulations state that "no motor carrier shall permit or require any driver used by it to drive a property-carrying commercial vehicle, nor shall any driver drive a property-carrying commercial motor vehicle: . . . for any period after the end of the 14th hour after coming on duty . . . ."

b.  Tim Simonds reported to work between 6 a.m. and 6:15 a.m. in Pine Mountain Valley, Georgia, Eastern Standard Time. Mr. Howell was killed in a collision in Phenix City, Alabama, in the Central Time Zone at 9:37 p.m.

c.  At the time of this collision, Mr. Simonds was in violation of the Federal Motor Carrier Safety Regulations. Had Mr. Simonds complied with the Federal Motor Carrier Safety Regulations, he would not have been driving the log truck on the evening of October 5, 2005, and Mr. Howell would not have been killed.

## THE BIFURCATION ORDER, IF LEFT UNCHANGED, WILL CAUSE PLAINTIFF TO INCUR TENS OF THOUSANDS OF DOLLARS IN ADDITIONAL EXPENSES

Attached as Exhibit A is an affidavit from a paralegal employed with Cunningham, Bounds, who attests to the very high costs associated with having Plaintiff's experts come to Alabama to testify. Given the experience and costs related to the taking of their depositions, it is quite reasonable to infer that Mrs. Howell will incur another $25,000 in costs in bringing the experts back to Alabama on two occasions to testify in conformance with the Court's bifurcation plan.

Other, similar additional costs will relate to hotel accommodations, travel, and food for Mrs. Howell's counsel and support personnel.

These pragmatic problems also weigh in favor of a re-examination of the Court's present trial plan. *See, Brown v. Advantage Engineering, Inc.*, 732 F.Supp. 1163, 1170-71 (N.D. Ga. 1990) (separate trials would require recalling several out-of-state witnesses, and

this factor indicates "that bifurcation would actually inhibit, rather than promote, efficient judicial administration").

## CONCLUSION

As the aforementioned evidence indicates, the following allegations in Plaintiff's Fifth and Sixth Causes of Action are inexplicably intertwined and overlap evidence directed to the negligence and/or wantonness of Tim Simonds, Jimmy Jones, Jr. and J&J Wood in causing the collision which killed James Farrell Howell at the very time of that collision:

a.  Negligently failing to observe, follow, respect, and/or abide by the Federal Motor Carrier Safety Regulations;

c.  Negligently failing to observe, follow, respect and/or conform their conduct to the Alabama Department of Transportation Rules of the Road;

d.  Negligently failing to implement a safety program capable of educating drivers on safety-sensitive issues;

f.  Negligently failing to train, educate and/or inform drivers such as Timothy Lee Simonds of the hazards and unique characteristics associated with the operation of logging trucks;

g.  Negligently failing to train the defendant Timothy Lee Simonds in the operation of logging trucks in light of the fact that he had never operated a truck of this type prior to his employment with the defendant J&J Wood, Inc., a mere two months prior to the wreck which killed James Farrell Howell;

h.  Negligently failing to provide the defendant Timothy Lee Simonds with the training, skills, knowledge, education, and experience necessary to safely and prudently operate the defendant J&J Wood, Inc.'s logging trucks;

i.  Negligently failing to provide the defendant Simonds with a driver trainer qualified to evaluate his competency, skills, experience and education with regard to the operation of logging trucks;

j.  Negligently failing to instruct Defendant Simonds and other drivers in the applicable rules and regulations they are expected to abide by in the operation, inspection and maintenance of commercial vehicles;

22

m.  Negligently failing to conduct a proper background check on defendant Timothy Lee Simonds;

o.  Negligently failing to properly and adequately weigh the logging truck made the basis of this suit and other J&J Wood, Inc.'s trucks owned and operated by the defendant J&J Wood, Inc.;

p.  Negligently failing to implement policies, procedures and practices which would ensure the safe and responsible weight and operation of the defendant J&J Wood, Inc.'s logging trucks;

q.  Negligently failing to properly maintain, inspect and remedy defects of the subject logging truck and other J&J Wood, Inc.'s logging trucks;

r.  Negligently promoting the unsafe and irresponsible operation of logging trucks by paying overweight tickets for its drivers;

s.  Negligently overloading logging trucks;

t.  Negligently allowing and/or encouraging and/or requiring drivers to operate overloaded logging trucks;

u.  Negligently maintaining, inspecting and remedying defects associated with J&J Wood, Inc.'s logging trucks, including the logging truck made the basis of this lawsuit;

v.  Negligently allowing the logging truck to be operated in an unsafe condition;

w.  Negligently operating and/or allowing the truck and/or trailer made the basis of this lawsuit to be operated with inadequate and improper lighting;

x.  Negligently operating and/or allowing the truck and/or trailer made the basis of this lawsuit to be operated despite it being declared out of service by the Federal Motor Carrier Safety Assistance Patrol;

y.  Negligently failing to properly supervise the operation of the subject logging truck and/or trailer;

z.  Negligently operating and/or allowing to be operated the subject logging truck and/or trailer with low tire pressure as defined by the manufacturer of the tires and as defined by the size of the load being carried;

aa. Negligently operating and/or allowing to be operated the subject logging truck and/or trailer with improper and inadequate tread depths on multiple tires throughout the vehicle and its trailer;

cc.   Negligently operating and/or allowing to be operated the subject logging truck and/or trailer at night with inadequate lighting;

ee.   Negligently failing to obtain and/or require a drug screen after the subject incident which killed James Farrell Howell;

ff.   Negligently failing to have a single CDL-trained operator responsible for training drivers on the operation of J&J Wood, Inc.'s logging trucks;

gg.   Negligently operating and/or allowing to be operated an overweight logging truck and/or trailer in violation of state rules and regulations in addition to manufacturer's recommendations;

hh.   Negligently operating and/or directing Timothy Lee Simonds to operate the logging truck and/or trailer that is the subject of this lawsuit despite a defective and flat tire;

ii.   Negligently failing to properly inspect and/or repair the subject tire prior to putting the truck and/or trailer back on the roadway;

jj.   Negligently failing to mark the hazardous area around this disabled logging truck and/or trailer and to put out emergency triangles and flares; and

oo.   Negligently hiring defendant Timothy Lee Simonds to a safety-sensitive position.

Additionally, corresponding subsections would also be applicable to Plaintiff's Sixth Cause of Action related to wantonness allegations.

Accordingly, Plaintiff, Charlene Howell, moves this Court to alter, amend, vacate, and/or clarify its previous order of July 6, 2007, regarding bifurcation to allow for the introduction of the aforementioned evidence in the first liability phase of said trial, as such evidence is direct evidence of Simonds' negligent and/or wanton operation of the vehicle prior to and at the time of the collision, it is direct evidence of Jimmy Jones, Jr.'s negligence and wantonness prior to and at the time of the collision, and it is direct evidence of the negligence and wantonness of J&J Wood prior to and at the time of the collision. The aforementioned evidence directly applies to the condition of the vehicle at the time of

24

impact, the maneuvers and decisions made at the time of impact, and the qualifications and physical abilities of the driver, his training and his experience at the time of impact, and are so intertwined and overlapping as to be incapable of bifurcation.

Additionally, Plaintiff would ask for clarification related to her ability to examine Mr. Simonds by leading questions and to cross-examine him concerning his numerous false representations, fraudulent conduct and inconsistent statements and testimony.

Respectfully submitted,

**/s/David S. Cain, Jr. (CAIND4894)**
/s/George W. Finkbohner (FINKG0362)
/s/David G. Wirtes, Jr. (WIRTD6693)
Attorneys for Plaintiff
Cunningham, Bounds, Crowder, Brown &
Breedlove
P.O. Box 66705
Mobile, AL 36660
PH: 251-471-6191
FX: 251-479-1031
E-mail: DSC@cbcbb.com

## CERTIFICATE OF SERVICE

I hereby certify that on the __13th__ day of July, 2007, I electronically filed the foregoing with the Clerk of Court using CM/EC. which will send notification of such filing to the following:

PAUL A. MILLER, ESQUIRE
CINDY L. SELF, ESQUIRE
Lamar, Miller, Norris, Haggard & Christie, P.C.
501 Riverchase Parkway East, Suite 100
Birmingham, Alabama 35244

**/s/David S. Cain, Jr., Esq.**

# EXHIBIT A

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

CHARLENE HOWELL, etc., §
§
  Plaintiff, §
§
v. §  CASE NO. 06-417
§
J & J WOOD, INC., et al., §
§
  Defendants. §

AFFIDAVIT

STATE OF ALABAMA

COUNTY OF MOBILE

  Before me, the undersigned authority, personally appeared Karen Hyde, who, being by me first duly sworn, deposes on oath and states as follows:

  1.  My name is Karen Hyde. I am over the age of twenty-one (21) years and I have personal knowledge of the information stated herein.

  2.  Plaintiff has retained two experts in the above-referenced cause, James Sobek and Walt Guntharp, to provide expert deposition testimony.

  3.  Plaintiff's expert, James Sobek, is currently billing Plaintiff's counsel at a rate of $300.00 per hour for travel time, and $475.00 per hour for time spent testifying.

  4.  Plaintiff's expert, Walt Guntharp, is currently billing Plaintiff's counsel at a rate of $195.00 per hour for travel time, and $317.50 per hour for time spent testifying.

5.     These experts recently traveled to Mobile, Alabama, for their depositions in this case.

6.     Plaintiff's counsel was billed $11,806.27 for the travel time and expenses associated with these experts' depositions.

7.     Additionally, Plaintiff's counsel was billed $1,732.50 for the deposition testimony of these experts.

8.     Plaintiff would reasonably anticipate that to require an additional trip by these experts to Opelika, Alabama, to testify twice in the above-referenced cause will subject the Plaintiff and her counsel to incur additional expenses in the amount of $13,538.77 each time both experts make another trip to Alabama.

Further affiant sayeth not.


_____
KAREN HYDE


STATE OF ALABAMA

COUNTY OF MOBILE

Before me, the undersigned authority, a Notary Public in and for said State and County, personally appeared KAREN HYDE, who is known to me, and who, after being duly sworn, does depose and say that the facts set forth in the foregoing affidavit are true and correct to the best of her knowledge, information and belief.

Sworn to and subscribed before me on this _12th_ day of July, 2007.


_____
NOTARY PUBLIC

My Commission Expires:_____ My Commission Expires 10-27-10